# CIVIL COVER SHEET

JS 44 (Rev. 12/07) (cand rev 1-16-08)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

ALLENE McINTYRE, ETC. ET AL.

**DEFENDANTS**

NORTHROP GRUMMAN SHIP SYSTEMS, INC.

**(b)** County of Residence of First Listed Plaintiff Solano County, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    State of Mississippi
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

David R. Donadio, ESQ
Brayton Purcell LLP
222 Rush Landing Road, JMD#9
Novato, California 94948

Attorneys (If Known)

ADR

EDL   E-filing

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | | | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| | | | ☐ 790 Other Labor Litigation | | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | | ☐ 871 IRS—Third Party | ☐ 900Appeal of Fee |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | Under Equal Access |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | | to Justice |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | State Statutes |
| | Other | | Alien Detainee | | |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

Transferred from    Appeal to District

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Diversity of Citizenship; 25 USC Section 1332

Brief description of cause:
Asbestos Wrongful Death with Personal Injury - Survival

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION    DEMAND $    CHECK YES only if demanded in complaint:
UNDER F.R.C.P. 23    JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**   PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)    ☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE 6/23/08

SIGNATURE OF ATTORNEY OF RECORD
David R. Donadio



ALAN R. BRAYTON, ESQ., S.B. #73685
DAVID R. DONADIO, ESQ., S.B. #154436
BRAYTON❖PURCELL LLP
Attorneys at Law
222 Rush Landing Road
Novato, California 94948-6169
(415) 898-1555
(415) 898-1247 (Fax No.)

Attorneys for Plaintiffs

E-filing

EDL

# THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

CV 08 3070

| | |
|---|---|
| ALLENE McINTYRE, as Wrongful Death Heir, and as Successor-in-Interest to EDWARD McINTYRE, Deceased; and SARAH McINTYRE, as Legal Heir of EDWARD McINTYRE, Deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>NORTHROP GRUMMAN SHIP SYSTEMS, INC.,<br><br>Defendant. | No. _____<br><br>COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS;<br><br>DEMAND FOR JURY TRIAL |

**I.**

**PARTIES**

1.     Plaintiffs in this action are the above captioned successor-in-interest to, or the personal representative of the estate of Decedent; and the personal representatives on behalf of the legal heirs, or the heirs-at-law, of the Decedent, and are all hereinafter referred to as "Plaintiffs".

2.     The person who sustained asbestos-related lung injuries and death as a result of their inhalation of asbestos fibers through the person's occupational exposure to asbestos, hereinafter "Decedent" is, with the date of death: EDWARD McINTYRE died July 19, 2007. ALLENE McINTYRE is the spouse of EDWARD McINTYRE and is hereinafter referred to as

K:\Injured\106109\FED - WD\Cmp Fed Solo WD.wpd

1
COMPLAINT

1   "surviving spouse".

2       3.     Decedent sustained an asbestos-related lung disease and death by precisely the
3 following mechanism: the inhalation of asbestos fibers released during the handling of asbestos-
4 containing products at decedent's jobsites. The pathogenesis of decedent's asbestos-related
5 diseases is explained on **Exhibit A**, attached to plaintiff's complaint and incorporated by
6 reference herein.

7       4.     All of plaintiffs' claims arise out of a similar series of occurrences:  repeated
8 exposure to asbestos-containing products manufactured, distributed, and/or sold by defendants
9 and supplied to, installed and/or maintained by defendants at Decedent' worksites, over a period
10 of years, caused from release of toxic asbestos fibers and subsequent inhalation by the decedent,
11 resulting in cumulative, progressive, incurable lung diseases.

12       5.     Each plaintiff claims damages for an asbestos-related disease arising from an
13 identical series of occurrences not dependent on decedent's worksite but on the fact that
14 asbestos-containing products, when handled in the manner in which they were intended, released
15 harmful asbestos fibers which when inhaled by decedent, caused serious lung disease. The
16 allegations of plaintiffs regarding the nature of decedent's asbestos-related diseases, the nature of
17 asbestos; the propensity of asbestos to cause disease, the criteria for diagnosis of disease, are all
18 identical.

19       6.     Plaintiffs are informed and believe, and thereon allege, that at all times herein
20 mentioned, defendants were and are corporations, partnerships, unincorporated associations, sole
21 proprietorships and/or other business entities organized and existing under and by virtue of the
22 laws of the State of California, or the laws of some other state or foreign jurisdiction, and that
23 said defendants, and each of them, were and are authorized to do and are doing business in the
24 State of California, and that said defendants have regularly conducted business in the State of
25 California.

26   ////
27   ////
28   ////

**II.**

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

7.    Jurisdiction:  Plaintiff ALLENE McINTYRE and SARAH McINTYRE are citizen of California.  Defendant NORTHROP GRUMMAN SHIP SYSTEMS, INC., is a  corporation having its principal places of business in Mississippi..

This Court has original jurisdiction under 25 USC § 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars.

8.    Venue / Intradistrict Assignment.    Venue is proper in the Northern District of California and assignment to the San Francisco Division of said district is proper as a substantial part of the events or omissions which give rise to the claims asserted by plaintiffs herein occurred within the County of San Francisco, California, and all of the defendants are subject to personal jurisdiction in this district at the time the action is commenced.

**III.**

**CAUSES OF ACTION**

FIRST CAUSE OF ACTION
(Negligence - Survival)

PLAINTIFF ALLENE McINTYRE AS SUCCESSOR-IN-INTEREST TO THE DECEDENT EDWARD McINTYRE COMPLAINS OF DEFENDANTS NORTHROP GRUMMAN SHIP SYSTEMS, INC. THEIR "ALTERNATE ENTITIES,"AND EACH OF THEM;  EACH FOR A COUNT FOR NEGLIGENCE (SURVIVAL) ALLEGE AS FOLLOWS:

9.    At all times herein mentioned, each of the named defendants was the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, holding company, affiliate, venturer, co-venturer, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale,

1 supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating, promoting,

2 representing, endorsing servicing, installing, contracting for installation, repairing, marketing,

3 warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or

4 otherwise directing and/or facilitating the use of, or advertising a certain product, namely

5 asbestos, and/or other products containing asbestos. Said entities shall hereinafter collectively be

6 called ALTERNATE ENTITIES. Each of the herein named defendants is liable for the tortious

7 conduct of each successor, successor in business, successor in product line or a portion thereof,

8 assign, predecessor in product line or a portion thereof, parent, holding company, affiliate,

9 venturer, co-venturer, subsidiary, whole or partial owner, or wholly or partially owned entity, or

10 entity that it was a member of, or funded, that researched, studied, manufactured, fabricated,

11 designed, modified, labeled, assembled, distributed, leased, bought, offered for sale, supplied,

12 sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted,

13 rebranded, manufactured for others and advertised a certain product, namely asbestos, and other

14 products containing asbestos. The following defendants, and each of them, are liable for the acts

15 of each and every ALTERNATE ENTITY, and each of them, in that there has been a virtual

16 destruction of plaintiff's remedy against each such ALTERNATE ENTITY; defendants, and each

17 of them, have acquired the assets, product line, or a portion thereof, of each such ALTERNATE

18 ENTITY; defendants, and each of them, caused the destruction of plaintiffs' remedy against each

19 such ALTERNATE ENTITY; each such defendant has the ability to assume the risk-spreading

20 role of each such ALTERNATE ENTITY; and that each such defendant enjoys the goodwill

21 originally attached to each such ALTERNATE ENTITY:

22 DEFENDANT                           ALTERNATE ENTITY

23 NORTHROP GRUMMAN                    AVONDALE INDUSTRIES, INC.
   SHIP SYSTEMS, INC.                  AVONDALE SHIPYARDS, INC.
24                                     INGALLS SHIPBUILDING, INC.

25

26          10.    At all times herein mentioned, defendants, their ALTERNATE ENTITIES, and

27 each of them, were and are engaged in the business of researching, manufacturing, fabricating,

28 designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale,

1   supplying, selling, inspecting, endorsing, testing, authorizing, approving, certifying, facilitating,
2   promoting, representing, servicing, installing, contracting for installation, repairing, marketing,
3   warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or
4   otherwise directing and/or facilitating the use of, or advertising a certain product, namely
5   asbestos and other products containing asbestos.

6       11.     At all times herein mentioned, defendants, their ALTERNATE ENTITIES and
7   each of them, singularly and jointly, negligently, and carelessly researched, manufactured,
8   fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed
9   to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale,
10  supplied, sold, inspected, serviced, authorized, approved, certified, facilitated, promoted,
11  installed, represented, endorsed, contracted for installation of, repaired, marketed, warranted,
12  rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos,
13  and other products containing asbestos, in that said products caused personal injuries to users,
14  consumers, workers, bystanders and others, including the decedent herein, (hereinafter
15  collectively called "exposed persons"), while being used in a manner that was reasonably
16  foreseeable, thereby rendering said products hazardous, unsafe, and dangerous for use by
17  "exposed persons".

18      12.     Defendants, their ALTERNATE ENTITIES, and each of them, had a duty to
19  exercise due care in the pursuance of the activities mentioned above and defendants, and each of
20  them, breached said duty of due care.

21      13.     Defendants, their ALTERNATE ENTITIES and each of them, knew, or should
22  have known, and intended that the aforementioned asbestos and products containing asbestos and
23  related products and equipment, would be transported by truck, rail, ship, and other common
24  carriers, that in the shipping process the products would break, crumble, or be otherwise
25  damaged; and/or that such products would be used for insulation, construction, plastering,
26  fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not
27  limited to unpacking, preparing, using, sawing, drilling, chipping, hammering, scraping, sanding,
28  breaking, removing, maintaining, inspecting, "rip-out", and other manipulation, resulting in the

1  release of airborne asbestos fibers, and that through such foreseeable use and/or handling

2  "exposed persons", including decedent herein, would use or be in proximity to and exposed to

3  said asbestos fibers, which contaminated the packaging, products, environment, and clothing of

4  persons working in proximity to said products, directly or through reentrainment.

5  14.    Decedent had used, handled, or been otherwise exposed to asbestos and asbestos-

6  containing products referred to herein in a manner that was reasonably foreseeable. Decedent's

7  exposure to asbestos and asbestos-containing products is on current information as set forth at

8  various locations and circumstances in **Exhibit A,** attached hereto and incorporated by reference

9  herein.

10  15.    As a direct and proximate result of the acts, omissions, and conduct of the

11  defendants, their ALTERNATE ENTITIES, and each of them, as aforesaid, decedent's exposure

12  to asbestos and asbestos-containing products caused severe and permanent injury, damage, loss,

13  or harm to the Decedent as set forth in **Exhibit A**, attached to plaintiffs' complaint and

14  incorporated by reference herein.

15  16.    Plaintiffs are informed and believes, and thereon alleges, that progressive lung

16  disease, cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers

17  without perceptible trauma and that said injury, damage, loss, or harm results from exposure to

18  asbestos and asbestos-containing products over a period of time.

19  17.    Decedent suffered from a condition related to exposure to asbestos and asbestos-

20  containing products. Decedent was not aware at the time of exposure that asbestos or asbestos-

21  containing products presented any risk of injury and/or disease.

22  18.    As a direct and proximate result of the aforesaid conduct of the defendants, their

23  "alternate entities," and each of them, Decedent incurred liability for physicians, surgeons,

24  nurses, hospital care, medicine, hospices, X-rays and other medical treatment, the true and exact

25  amount thereof being unknown to plaintiffs at this time, and plaintiffs pray leave to amend this

26  complaint accordingly when the true and exact cost thereof is ascertained.

27  19.    As a direct and proximate result of the aforesaid conduct of the defendants, their

28  ALTERNATE ENTITIES, and each of them, Decedent incurred liability for the reasonable value

1  of medial care provided by decedent's family members measured by, inter alia, the costs
2  associated with the hiring a registered nurse, home hospice, or other service provider, the true
3  and exact amount thereof being unknown to plaintiffs at this time, and plaintiffs pray leave to
4  amend this complaint accordingly when the true and exact costs are known or at time of trial.

5      20.     As a direct and proximate result of the aforesaid conduct of defendants, their
6  ALTERNATE ENTITIES, and each of them, Decedent suffered permanent injuries to his person,
7  body, and health, including, but not limited to, asbestosis, other lung damage, and cancer and
8  related sequelae, and the mental and emotional distress attendant thereto, and ultimately death,
9  from the effect of exposure to asbestos fibers, all to his general damage in the sums to be proven
10  at trial.

11     21.     As a further direct and proximate result of the said conduct of the defendants,
12  their ALTERNATE ENTITIES, and each of them, Decedent incurred loss of income, benefits,
13  entitlements, wages, profits, and commissions, a diminishment of earning potential, and other
14  pecuniary losses, the full nature and extent of which are not yet known to plaintiffs; and leave is
15  requested to amend this complaint to conform to proof at the time of trial.

16     22.     As a further direct and proximate result of the said conduct of the defendants,
17  their ALTERNATE ENTITIES, and each of them, decedent's exposure to asbestos and asbestos-
18  containing products caused severe and permanent injury to Decedent, and ultimately Decedent
19  died on the date previously stated herein.

20     23.     Defendants, their ALTERNATE ENTITIES, and each of them, and their officers,
21  directors and managing agents participated in, authorized, expressly and impliedly ratified, and
22  had full knowledge of, or should have known of, each of the acts set forth herein.

23     24.     Defendants, their ALTERNATE ENTITIES, and each of them, are liable for the
24  fraudulent, oppressive, and malicious acts of their ALTERNATE ENTITIES, and each of them,
25  and each defendant's officers, directors, and managing agents participated in, authorized,
26  expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of
27  each of their ALTERNATE ENTITIES as set forth herein.

28  ////

1      25.    The herein-described conduct of said defendants, their ALTERNATE ENTITIES,

2 and each of them, was and is despicable, willful, malicious, fraudulent, outrageous, and in

3 conscious or reckless disregard and indifference to the safety, health, and rights of "exposed

4 persons", including Decedent herein, giving rise to decedent's claim herein alleged for punitive

5 damages against said defendants.

6      WHEREFORE, plaintiffs pray judgment against defendants, and each of them, as

7 hereinafter set forth.

8 SECOND CAUSE OF ACTION

9 (Products Liability - Survival)

10 PLAINTIFF ALLENE McINTYRE AS SUCCESSOR-IN-INTEREST TO THE DECEDENT

11 EDWARD McINTYRE COMPLAINS OF DEFENDANTS NORTHROP GRUMMAN SHIP

12 SYSTEMS, INC. THEIR "ALTERNATE ENTITIES,"AND EACH OF THEM;   EACH FOR

13 A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR

14 PRODUCTS LIABILITY (SURVIVAL), COMPLAIN AS FOLLOWS:

15      26.    Plaintiffs incorporates herein by reference, as though fully set forth herein, each

16 paragraph of the First Cause of Action herein.

17      27.    Defendants, their "alternate entities", and each of them, knew and intended that

18 the above-referenced asbestos and asbestos-containing products would be used by the purchaser

19 or user without inspection for defects therein or in any of their component parts and without

20 knowledge of the hazards involved in such use.

21      28.    Said asbestos and asbestos-containing products were defective and unsafe for their

22 intended purpose in that the inhalation or ingestion of asbestos fibers causes serious disease

23 and/or death. The defect existed in the said products at the time they left the possession of

24 defendants, their ALTERNATE ENTITIES, and each of them. Said products did, in fact, cause

25 personal injuries, including asbestosis, other lung damage, cancer, and death to "exposed

26 persons", including Decedent herein, while being used in a reasonably foreseeable manner,

27 thereby rendering the same defective, unsafe, and dangerous for use.

28 ////

1    29.    "Exposed persons" did not know of the substantial danger of using said products.

2    Said dangers were not readily recognizable by "exposed persons".  Said defendants, their

3    ALTERNATE ENTITIES, and each of them, further failed to adequately warn of the risks to

4    which Decedent and others similarly situated were exposed.

5    30.    In researching, manufacturing, fabricating, designing, modifying, testing or failing

6    to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for

7    sale, supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating,

8    promoting, representing, endorsing servicing, installing, contracting for installation, repairing,

9    marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos

10    and asbestos-containing products, defendants, their ALTERNATE ENTITIES, and each of them,

11    did so with conscious disregard for the safety of "exposed persons" who came in contact with

12    said asbestos and asbestos-containing products, in that said defendants, their ALTERNATE

13    ENTITIES, and each of them, had prior knowledge that there was a substantial risk of injury or

14    death resulting from exposure to asbestos or asbestos-containing products, including, but not

15    limited to, asbestosis, other lung damages, and cancer.  Said knowledge was obtained, in part,

16    from scientific studies performed by, at the request of, or with the assistance of, said defendants,

17    their ALTERNATE ENTITIES, and each of them, and which knowledge was obtained by said

18    defendants, their ALTERNATE ENTITIES, and each of them on or before 1930, and thereafter.

19    31.    On or before 1930, and thereafter, said defendants, their ALTERNATE

20    ENTITIES and each of them, were aware that members of the general public and other "exposed

21    persons", who would come in contact with their asbestos and asbestos-containing products, had

22    no knowledge or information indicating that asbestos or asbestos-containing products could

23    cause injury, and said defendants, their ALTERNATE ENTITIES, and each of them, knew that

24    members of the general public and other "exposed persons", who came in contact with asbestos

25    and asbestos-containing products, would assume, and in fact did assume, that exposure to

26    asbestos and asbestos-containing products was safe, when in fact said exposure was extremely

27    hazardous to health and human life.

28    ////

1        32.    With said knowledge, said defendants, their ALTERNATE ENTITIES, and each

2   of them, opted to research, manufacture, fabricate, design, modify, label, assemble, distribute,

3   lease, buy, offer for sale, supply, sell, inspect, service, install, contract for installation, repair,

4   market, warrant, rebrand, manufacture for others, package and advertise said asbestos and

5   asbestos-containing products without attempting to protect "exposed persons" from, or warn

6   "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and

7   asbestos-containing products. Rather than attempting to protect "exposed persons" from, or warn

8   "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and

9   asbestos-containing products, defendants, their ALTERNATE ENTITIES, and each of them,

10  intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed

11  and suppressed said knowledge from "exposed persons" and members of the general public, thus

12  impliedly representing to "exposed persons" and members of the general public that asbestos and

13  asbestos-containing products were safe for all reasonably foreseeable uses. Defendants, their

14  ALTERNATE ENTITIES, and each of them, engaged in this conduct and made these implied

15  representations with the knowledge of the falsity of said implied representations.

16       33.    The above-referenced conduct of said defendants, their ALTERNATE ENTITIES,

17  and each of them, was motivated by the financial interest of said defendants, their ALTERNATE

18  ENTITIES, and each of them, in the continuing, uninterrupted research, design, modification,

19  manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply,

20  sale, inspection, installation, contracting for installation, repair, marketing, warranting,

21  rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or otherwise

22  directing and/or facilitating the use of, or advertising of asbestos and asbestos-containing

23  products. In pursuance of said financial motivation, said defendants, their ALTERNATE

24  ENTITIES, and each of them, consciously disregarded the safety of "exposed persons" and in fact

25  were consciously willing and intended to permit asbestos and asbestos-containing products to

26  cause injury to "exposed persons" and induced persons to work with and be exposed thereto,

27  including Decedent.

28  ////

1      34.     Plaintiffs alleges that the aforementioned defendants, their ALTERNATE

2 ENTITIES, and each of them impliedly warranted their asbestos and asbestos-containing

3 products, to be safe for their intended use, but that their asbestos and asbestos-containing

4 products, created an unreasonable risk of bodily harm to exposed persons.

5      35.     Plaintiffs relied upon defendants', their ALTERNATE ENTITIES, and each of

6 their representations, lack of warnings, and implied warranties of fitness of asbestos and their

7 asbestos-containing products. As a direct, foreseeable, and proximate result thereof, Decedent

8 suffered permanent injury and death as alleged herein.

9      36.     As a direct and proximate result of the actions and conduct outlined herein,

10 Decedent have suffered the injuries and damages herein alleged.

11      WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities", and

12 each of them, as hereinafter set forth.

13
## THIRD CAUSE OF ACTION
### (Negligence - Wrongful Death)

14

15 PLAINTIFF ALLENE McINTYRE, INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND

16 AS SUCCESSOR-IN-INTEREST TO EDWARD McINTYRE DECEASED, AND PLAINTIFFS

17 SARAH McINTYRE AS LEGAL HEIR OF DECEDENT, COMPLAIN OF DEFENDANTS

18 NORTHROP GRUMMAN SHIP SYSTEMS, INC., THEIR "ALTERNATE ENTITIES," AND

19 EACH OF THEM; EACH FOR A THIRD, SEPARATE, FURTHER AND DISTINCT CAUSE

20 OF ACTION FOR NEGLIGENCE (WRONGFUL DEATH), COMPLAIN AS FOLLOWS:

21      37.     Plaintiffs incorporates by reference each paragraph contained within the First

22 Cause of Action as though fully set forth herein.

23      38.     The heirs at law of the Decedent and their relationship to the Decedent is set forth

24 above.

25      39.     The individuals set forth as heirs constitute all of the surviving heirs of the

26 Decedent.

27      40.     As a direct and proximate result of the conduct of the defendants, their

28 ALTERNATE ENTITIES, and each of them, as aforesaid, the exposure to asbestos and asbestos-

1  containing products caused Decedent to develop diseases from which condition Decedent died.

2  Plaintiffs were unaware that the death caused by asbestos-related disease until within one year of

3  filing the complaint.

4    41.    At all times prior to his death, Decedent was a faithful and dutiful spouse to the

5  surviving spouse.

6    42.    As a direct and proximate result of the conduct of defendants, and each of them,

7  and the death of Decedent, Decedent's heirs have sustained pecuniary loss resulting from the loss

8  of care, society, comfort, attention, services, and support of Decedent all to the damage of

9  decedent's heirs.

10   43.    As a further direct and proximate result of the conduct of defendants, and each of

11  them, and the death of decedent, decedent's heirs have incurred funeral expenses in an amount

12  currently not ascertained.

13   WHEREFORE, plaintiffs pray judgment against defendants, and each of them, as

14  hereinafter set forth.

15
FOURTH CAUSE OF ACTION
(Products Liability - Wrongful Death)

16

17  PLAINTIFF ALLENE McINTYRE, INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND

18  AS SUCCESSOR-IN-INTEREST TO EDWARD McINTYRE DECEASED, AND SARAH

19  McINTYRE AS LEGAL HEIRS OF EDWARD McINTYRE, COMPLAIN OF DEFENDANTS

20  NORTHROP GRUMMAN SHIP SYSTEMS, INC., THEIR "ALTERNATE ENTITIES," AND

21  EACH OF THEM; AND EACH OF THEM; EACH FOR A FOURTH, SEPARATE,

22  FURTHER AND DISTINCT CAUSE OF ACTION FOR PRODUCTS LIABILITY

23  (WRONGFUL DEATH), COMPLAIN AS FOLLOWS:

24   44.    Plaintiffs incorporates herein by reference, as though fully set forth herein, each

25  paragraph of the First, Second and Third Causes of Action herein.

26   45.    As a direct and proximate result of the conduct of defendants, and each of them,

27  decedent's heirs have sustained the injuries and damages previously alleged.

28  ////

1    WHEREFORE, plaintiffs prays judgment against defendants, their "alternate entities",

2  and each of them, as hereinafter set forth.

3                                    **IV.**

4                          **DAMAGES AND PRAYER**

5    WHEREFORE, plaintiffs prays judgment against defendants, their "alternate entities",

6  and each of them in an amount to be proved at trial in each individual case, as follows:

7         (a)    For plaintiffs' general damages according to proof;

8         (b)    For plaintiffs' loss of income, wages and earning potential according to proof;

9         (c)    For plaintiffs' s medical and related expenses according to proof;

10        (d)    For plaintiffs' cost of suit herein;

11        (e)    For exemplary or punitive damages according to proof;

12        (f)    For damages for fraud according to proof; and

13        (g)    For such other and further relief as the Court may deem just and proper, including

14  costs and prejudgment interest.

15  Dated: 6/27/08                        BRAYTON❖PURCELL LLP

16

17                            By:

18                                 David R. Donadio
                                   Attorneys for Plaintiffs
19
                                **JURY DEMAND**
20
         Plaintiffs hereby demand trial by jury of all issues of this cause.
21

22

23  Dated: 6/28/08                        BRAYTON❖PURCELL LLP

24

25                            By:

26                                 David R. Donadio
                                   Attorneys for Plaintiffs
27

28

K:\Injured\106109\FED - WD\Cmp Fed Solo WD.wpd              13
                                                        COMPLAINT

EXHIBIT A

**Decedent: EDWARD LEE MCINTYRE, deceased**

**Decedent's injuries:** Decedent was diagnosed with mesothelioma on or about 2006. Decedent died on July 19, 2007.

**Defendants:** Plaintiffs contend that the asbestos-containing products to which Decedent was or may have been exposed to were manufactured, supplied, distributed, installed and/or contracted for by defendants and each of them.

Decedent's exposure to asbestos occurred at the following times and places, and involved exposure to dust created by the contractors and the products of the entities listed below. The exposure includes, but is not limited, to the following presently known contractors and the manufacturers and distributors of asbestos-containing products:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| U.S. Department of Defense | Mare Island Naval Shipyard, Painting Shops, Vallejo, CA; | Painter | 12/2/1963-**6/2/1995** |
| | ABRAHAM LINCOLN (SSBN-602) | | 7/1972-3/1974 |
| | ANCHORAGE (LSD-36) | | Late 1964 |
| | ANDREW JACKSON (SSBN-619) | | (3 weeks) |
| | BAINBRIDGE (DLGN-25) (CGN-25) | | 10/1967-5/1968, 12/1968 |
| | BARB (SSN-596) | | Late 1960s, 1974-1975 (3-6 months) |
| | BARBEL (SS-580) | | 1975-1976 |
| | DANIEL BOONE (SSBN-629) | | 1964 (1-2 weeks) |
| | DOLPHIN (AGSS-555) | | 1971, 1973, 1978-1979 |

|  | DRUM (SSN-677) |  | Late 1960s-Early 1970s |
|  | FLASHER (SSN-613) |  | 1975-1976 (3 months) |
| U.S. Department of Defense (contd.) | Mare Island Naval Shipyard, Painting Shops, Vallejo, CA; | Painter | 12/2/1963- 6/30/1995 |
|  | GRAYBACK (SSG-574) |  | 1967-1969 |
|  | GUARDFISH (SSN-612) |  | 8/1975-7/1977 (2-3 days) |
|  | GUITARRO (SSN-665) |  | 12/1965-9/1972 |
|  | GURNARD (SSN -662) |  | 12/1964-12/1968 |
|  | HADDOCK (SSN-621) |  | 4/1977-11/1978 |
|  | HALIBUT (SSN-587) |  | 10/1968-8/1970 |
|  | HAWKBILL (SSN-666) |  | 11/1966-2/1971 |
|  | INDRA (APL-37) |  | 6/1967-1/1968 (1-2 days) |
|  | JOHN MARSHALL (SSBN-611) |  | 11/1974-5/1976 |
|  | KAMEHAMEHA (SSBN-642) |  | 1964-12/1965 (8 months) |
|  | LONG BEACH (CLGN-160) (CGN-160) (CGN-9) |  | 1970-1971, Fall 1979 (6-12 days) |
|  | MARIANO G. VALLEJO (SSBN-658) |  | 7/1964-12/1966, late 1960s (2-3 years) |
|  | NEREUS (AS-17) |  | 11/1966-4/1967, 10/1971-1/1972 |

2                                    EXHIBIT "A"

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| U.S. Department of Defense (contd.) | Mare Island Naval Shipyard, Painting Shops, Vallejo, CA; | Painter | 12/2/1963- 6/30/1995 |
| | ORLECK (DD-886) | | Spring 1967, 1971 (2-4 weeks) |
| | ORTOLAN (ASR-22) | | 1970s (1 month) |
| | PARCHE (SSN-683) | | 1977-1981 |
| | PATRICK HENRY (SSBN-599) | | 7/1976-3/1978 (6 months) |
| | PERMIT (SSN-594) | | (1 year) |
| | PIGEON (ASR-21) | | 7/1979-2/1981 |
| | PINTADO (SSN-672) | | 8/1967-4/1971 |
| | PLUNGER (SSN-595) | | 10/1971-12/1973 |
| | POGY (SSN-647) | | 3/1980-5/1981 |
| | POLLACK (SSN-603) | | 5/1979-5/1981 (3 months) |
| | PORTERFIELD (DD-682) | | Mid 1960s (1 week) |
| | ROBERT E. LEE (SSBN-601) | | 2/1965-8/1966, 1970s (4-8 months) |
| | SALMON (SS-573) | | 1973-1974 |
| | SCAMP (SSN-588) | | 1/1965-6/1966, 1970s |

3                                    EXHIBIT "A"

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| U.S. Department of Defense (contd.) | Mare Island Naval Shipyard, Painting Shops, Vallejo, CA; | Painter | 12/2/1963-6/30/1995 |
| | SEA CLIFF (DSR-4) | | 11/1972-6/1973 |
| | SEAWOLF (SSN-575) | | 12/1970-5/1981 |
| | SHARK (SSN-591) | | 12/1970-5/1981 (6-8 months) |
| | SKIP JACK (SSN-585) | | 1977-1979 (6-12 months) |
| | SNOOK (SSN-592) | | 1973-1974 |
| | SOUTHERLAND (DD-743) | | 1964-1965, summer 1967, 8/1969-4/1971 |
| | STONEWALL JACKSON (SSBN-634) | | 1/1964-8/1964, 2/1965-3/1965, (6 months) 8/1969-4/1971 |
| | SWORDFISH (SSN-579) | | 11/1965-8/1967 (1-2 weeks) |
| | TAUTOG (SSN-639) | | 5/1977-5/1979 |
| | THOMAS A. EDISON (SSBN-610) | | 8/1973-11/1974 (6 months) |
| | TURTLE (DSV-3) | | 11/1973-5/1974, 9/1979-11/1980 |
| | WOODROW WILSON (SSBN-624) | | 1964 (2-3 weeks), 8/1969-2/1971 |
| | WORDEN (DLG-18) | | 1/1968-5/1968 (3-4 weeks) |

////

EXHIBIT "A"

Job Duties: Decedent worked initially as an apprentice painter for approximately four years, then as a painter, and as Production Shop Planner for Shop 71 from approximately 5/1981-6/1995. Decedent became nuclear certified in approximately 1965. Decedent's job duties included, but were not limited to, painting newly installed, damaged, and cut asbestos lagging on the pipes of the vessels , painting during new construction, sand blasting on various submarines and ships, scraping paint off the visible packing on steam valves, scraping paint off gaskets from pipe flanges, painting steam valves with high heat aluminum paint, and working with non-skid decking materials. Decedent primed steel hulls, metal surfaces, and foundations using zinc coatings. Decedent used a wire-brush to strip off rusty sections before priming. Decedent performed zinc priming work to correct deficiencies in areas primed earlier. Decedent painted bilges. Decedent cleaned by sweeping up dust and debris from the bilges prior to painting them. Dust and debris was frequently found in the bilge areas. Decedent cleaned and swept up GARLOCK gasket debris. Prior to painting, decedent cleaned and dusted off debris and dust in his area. Prior to painting, decedent sometimes prepped the surface areas by sanding with sandpaper or a pneumatic hand sander. Decedent painted during the new construction of submarines including, but not limited to, the WOODROW WILSON (SSBN-624), DANIEL BOONE (SSBN-629), STONEWALL JACKSON (SSBN-634), KAMEHAMEHA (SSBN-642), MARIANO G. VALLEJO (SSBN-658), GURNARD (SSN-662), DRUM (SSN-677), GUITARRO (SSN-665), HAWKBILL (SSN-666), and the PINTADO (SSN-672).

On the GUITARRO (SSN-665), decedent worked on this submarine when it was in the shipbuilding ways before it sank, and in the outfitting dock after it sank. Before the submarine sank, decedent prepped and painted tanks and foundations. Decedent worked in proximity to other trades, such as: shipfitters, welders, temporary utilities workers (shop 99) installing electrical lights, and bringing in ventilation, and shop 64. After the submarine had sunk, decedent saw 300 kilowatt generators installed at the outfitting dock. Decedent worked approximately one year onboard this submarine for approximately one year when it was in the outfitting dock. Decedent worked in the nuclear certified areas. Decedent worked in the Auxiliary Machine Space (AMS), engine room, tunnel, and reactor compartment. Decedent worked for approximately three to five months in the reactor compartment, and for approximately five to six months in the AMS and engine room. Decedent prepped and painted steam lines, lagging, electrical panels, and electrical boxes in the AMS. Decedent prepped and painted lagging, steam valves, and pumps in the reactor. Decedent painted lagging and high heat valves in the tunnel. Decedent painted lagging, pumps, and electrical panels in the engine room. Decedent saw packing and sheets of GARLOCK gasket material. Decedent saw other trades work on flooring. Decedent was near other trades performing electrical outlet work.

On the HAWKBILL (SSN-666), decedent worked on this submarine when it was in the shipbuilding ways, and in the outfitting dock. Decedent spent approximately 6 to 12 months working aboard this submarine when it was located in the ways. Decedent spent approximately six to eight months working aboard this submarine when it was located at the outfitting dock. Decedent worked in all compartments when the submarine was in the ways. Decedent worked near other trades, such as: painters, shipfitters, welders, and temporary utilities workers. Decedent worked in the nuclear certified areas when the submarine was in the outfitting docks. Decedent worked in the reactor, tunnel, AMS, and engine room. Decedent painted lagging in the reactor, tunnel, AMS, and engine room. Decedent prepped and painted pumps in the engine room. Decedent prepped and painted large electric panels in the AMS. Decedent painted valves.

On the PINTADO (SSN-672), decedent worked on this submarine when it was in the shipbuilding ways, and in the outfitting dock. Decedent spent approximately six months working aboard this submarine when it was located in the ways. Decedent spent approximately one year

working aboard this submarine when it was located at the outfitting dock. Decedent worked near other trades, such as: painters, shipfitters, riggers, cleaners, laborers, pipefitters, shipfitters, and welders. Decedent spent approximately nine months working in the nuclear certified areas. Decedent worked in the engine room, AMS, and reactor compartment. Decedent did the paint-out of the reactor compartment. Decedent prepped and painted lagging, and steam pipes in the nuclear certified areas. Decedent worked near and saw insulators installing insulation. Decedent worked near and saw insulators working in the AMS. Decedent saw reduction gear opened up. Decedent saw decking work.

On the DRUM (SSN-677), decedent worked on this submarine when it was in the shipbuilding ways and the outfitting dock. Decedent spent approximately six months working aboard this submarine when it was located in the ways. Decedent spent approximately one year working aboard this submarine when it was located at the outfitting dock. Decedent worked approximately nine months in the nuclear certified areas. Decedent prepped and painted in the bilges, and the bulkhead between the Reactor and AMS. Decedent painted the entire AMS, including lagging and electrical panels. Decedent spent approximately four months working in the AMS. Decedent worked approximately two to three months in the AMS, reactor and tunnel doing the paint-out. During the paint-out, decedent dusted off lagging prior to painting, and painted pumps. Decedent sat on lagging while painting the lagging. Decedent painted pumps. Decedent painted in the engine room. Decedent spent approximately two to three months working in the engine room. Decedent painted in the tunnel. Decedent painted stainless steel piping and valves. Decedent saw welders, shipfitters, electricians (running woven aluminum ½" armored wiring, and cabling that had a black rubber covering), pipefitters (installing piping and setting up pipe hangers), riggers (working with pumps), machinists (installing pumps and valves), and Shop 99 temporary utilities. Decedent recalled co-workers: Prentice Ivory, Oakland, California; and Arthur Harris, Vallejo, California.

Decedent's job duties included, but were not limited to, painting duties at the various Painting Shops including, but not limited to, 11, 17, 45, 71 and 72, all shops in close proximity to Shop 31, Drydocks 1, 2, 3, and 4, Berths 8, 9, 10, Building 116, Building 334, Building 750, Building 418, Building 680, Building X11-390, and in the Shipfitters' Building 390. Decedent recalled this was a shipfitters' shop where decedent's job duties included, but were not limited to, mixing cream colored 'lagging paste' into 5 gallon buckets of paint. Decedent recalled that the mixture was similar to a substance the insulators used as a finishing cement. Decedent worked on new construction from 1964 through 1972 at Building Ways 1 through 4; Berths 8 through 10; and Drydocks 2 and 3. Decedent sandblasted in the 1970s in the radiation areas of main ballast tanks, interior tanks, and the outer hull and sail areas. Decedent recalled that 90 percent of the painting work he performed was on nuclear and diesel submarines in the living spaces, topside, forward area, sail areas, engineering spaces, back portion areas, torpedo rooms, in various tanks including ballast tanks, W.R.T. tanks, auxiliary tanks, and machinery rooms called the Auxiliary MR1 and Auxiliary MR2 on nuclear submarines. Decedent recalled that 10 percent of his work was on surface ships and 20-30 percent of that time on surface ships was in the machinery spaces, boiler rooms, and engine spaces.

Decedent painted the inside of the water tanks on surface ships including the INDRA (APL-37). After the old coating had been sandblasted off, decedent vacuumed the sandblasting dust from inside the tank. Decedent used a compressor to spray DIMETCOTE (AMERON INTERNATIONAL CORPORATION) inorganic zinc paint in the water tanks. Decedent used duct tape to mask all the areas that were not to be painted. Decedent wore a pair of disposable coveralls over his work coveralls when spray painting. Decedent taped his wrists and ankles with duct tape in an attempt to keep the paint off his regular coveralls underneath. Decedent wore disposable plastic boot coverings

and taped them at his ankles. Decedent wore an air-fed hood with a plastic face shield when spraying paint. Decedent mixed the zinc powder into the paint in 5-7 gallon paint pots. Decedent did not remove his protective coveralls if he stopped to mix more paint or to clean the spray nozzle. Decedent recalled that the paint would start to dry on the coveralls and would crack and chip as he moved around. When decedent stopped painting to exit the tank for his meal break, he would remove all of his protective coverings and the duct tape. Decedent recalled that where the paint was dried, it would crack and chip as he unwound the tape from around his wrists and ankles. After decedent finished painting the first coat, he would check the paint dryness in order to paint the second coat. When checking for the paint dryness, decedent did not wear any type of protective hood or coverings into the tank as he walked around on the painted surfaces. After the tank had been painted with the second coat of zinc paint, decedent removed all the masking tape from the areas not painted. Decedent recalled that the paint was dry on the tape when he pulled it off and that it cracked, chipped, and created dust as he removed it. Decedent used a brush to paint the places where the spray missed and the areas damaged when pulling off the masking tape. Decedent did not wear any protective coverings when he painted in the tank with a brush. Decedent cleaned the paint pots and the nozzles by scraping off any hardened paint and then wiping them with thinner. Decedent did not clean the dried paint off the hoses because it would just chip and flake off later while being bent and moved. Decedent recalled that paint residue would often get on his regular work coveralls underneath the protective coverings. Decedent removed his regular coveralls and work boots and stored them in his locker at work. Decedent wore the same pair of coveralls for as long as two weeks before he turned them in for cleaning.

Over his career, decedent worked in Shop 06 Public Works; Shop 11 Shipfitters; Shop 17 Sheetmetal; Shop 26 Welding; Shop 31 Inside Machining; Shop 36 Fire Control; Shop 38 Outside Machining (shipboard); Shop 41 Boilers; Shop 51 Electrical; Shop 56 Pipe; Shop 64 Wood, Joiners, Lagging; Shop 67 Electronics; Shop 71 Paint, Glass, Silkscreen, Sandblasting; Shop 72 Cleaners, Riggers; Shop 99 Temporary Utilities; Shipfitters (structural steel) shop in Building 390; Sheetmetal Shops in Buildings 116 and 1310; Inside Machine Shop in Building 680; Boiler Shop in Building 122; Electrical and Electronics Shops in Building 866; Pipe Shop in Building 46; Wood Shop in Building 118; Paint, Glass, Silkscreen Shop in Buildings 334 and 750; Riggers and Cleaners Shop in Building 418; Building 900 and the Temporary Utilities Shop in Building 704. Decedent worked in all shops in close proximity to Berths 8 through 10; Drydocks 1 through 4; and Berths 14 through 17.

Decedent worked in close proximity to various trades, including but not limited to: machinists; electricians; painters, shipfitters; riggers; pipefitters; and insulators on submarines when installing and removing pipe insulation. Decedent prepped and painted in areas in which various other trades had just completed their work, such as: machinists, electricians, shipfitters, pipefitters, riggers, welders, and insulators. Decedent worked near outside contractors. Decedent worked in close proximity to insulators removing and installing the following brands of insulation including, but not limited to: JOHNS-MANVILLE (JOHNS-MANVILLE), OCF (OWENS CORNING FIBERGLAS), PHILIP CAREY (RAPID-AMERICAN CORPORATION), and EAGLE PICHER (EAGLE-PICHER). Insulators were insulating pipes, reduction gear, and turbines. Before he could start painting, decedent swept and cleaned up dust and debris after the pipefitters, steamfitters, welders, and insulators. Decedent recalled that insulation, packing, and gasket debris would land on him. Decedent recalled insulator co-workers: Harry Dickhaus, address unknown, and Rich Daffron, American Canyon, California.
////

K:\Injured\106109\FED - WD\FEDA (McIntyre WD).wpd

7                                    EXHIBIT "A"

Decedent worked in close proximity to the following asbestos-containing products during this employment: WALWORTH (THE WALWORTH COMPANY) valves, WORTHINGTON (DII INDUSTRIES, LLC) pumps, GARLOCK (GARLOCK SEALING TECHNOLOGIES, LLC) gaskets, A.W. CHESTERTON (A.W. CHESTERTON COMPANY) valve packing, INGERSOLL-RAND (INGERSOLL-RAND COMPANY) compressors, and ALLIS-CHALMERS (ALLIS-CHALMERS CORPORATION PRODUCT LIABILITY TRUST) and DELAVAL (IMO INDUSTRIES, INC.) turbines in the engine rooms. Decedent prepped and painted insulation on reduction gear. On the WORDEN (DLG-18), decedent worked around the boiler while it was open.

Decedent prepped and painted the following asbestos-containing electrical products including, but not limited to: panels, electrical boxes, and electrical outlets manufactured by ALLEN BRADLEY (ROCKWELL AUTOMATION, INC.), CUTLER HAMMER (EATON ELECTRICAL INC.), and SQUARE D (SQUARE D COMPANY).

Decedent recalled that a crew size of 7 to 15 painters was standard. Decedent currently the following co-workers: Ron Hansen, address currently unknown; Rickie Stewart, address currently unknown; Thomas L. Fisher, Napa, California; John H. Abston, Vallejo, California; Harvey E. Bantz, Napa, California; Michael A. Bostrom, Cordelia, California; Clarence Carravajal, Napa, California; Robert G. Carrell, Napa, California; Beverly S. Cortner, Helena, California; Bill V. Day Jr., Vallejo, California; Glenn N. Duque, Vallejo, California; Wayne C. Gordon, Sonoma, California; Nestor A. Gorospe, Vallejo, California; Arthur C. Harris, Vallejo, California; Robert A. Helsel, Napa, California; T.W. Humphries, Vallejo, California; Desmond T. Jeffers, Vallejo, California; Prentice Ivory, Oakland, California; D.T. Jones, Benicia, California; Roger M. Koch, Vallejo, California; Don W. Link, Vallejo, California; James L. McKinlay, Vallejo, California; William Patrick Morales, San Leandro, California; Curtis Ormiston, Vallejo, California; Robert R. Pendleton, Fairfield, California; W.H. Pinkstaff, San Pablo, California; Stephen Elias Walker, Vallejo, California; Daniel P. Wildemann, Vallejo, California; and Tom Szander, address unknown. Plaintiff currently contends that decedent was exposed to asbestos during this employment.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|----------|----------------------|-----------|----------------|
| U.S. Department of Defense | Naval Submarine Base, New London, Groton, CT | Painter | 9/1/1979-12/15/1979 |

NR-1

Job Duties: Decedent sand blasted and painted the NR-1 experimental submarine during overhaul work on this temporary duty assignment. Decedent did not recall any supervisors or co-workers. Plaintiff currently contends that decedent may have been exposed to asbestos during this employment.

////

////

K:\Injured\106109\FED - WD\FEDA (McIntyre WD).wpd

8                                              EXHIBIT "A"

| Employer | Location of Exposure | Job Title | Exposure Dates |
|----------|----------------------|-----------|----------------|
| Corps of Engineers, USAED Sacramento, 1325 J Street, Sacramento, CA 95812-2916 | Corps of Engineers, USAED Sacramento, 1325 J Street, Sacramento, CA | Unknown | 1996 |

Job Duties: Plaintiff is currently unaware of the specifics of this employment. Plaintiff is currently unaware if decedent was exposed to asbestos during this employment.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|----------|----------------------|-----------|----------------|
| Shelby Personnel Services Unlimited, Inc. 824 South Dekalb Street Shelby, NC | Eaton Automotive Charlotte, NC | Factory Worker | 10/1/1997-1999 |

Job Duties: Decedent was employed by a temporary employment agency that sent him to Eaton Automotive. Decedent's job duties included, but were not limited to, drilling holes with a drill press for a new transmission housing, and performing work on casings. Decedent recalled co-worker: Billy, last name unknown. Plaintiff is currently unaware if decedent was exposed to asbestos during this employment.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|----------|----------------------|-----------|----------------|
| Eaton Corporation 1111 Superior Avenue East Cleveland, OH | Eaton Automotive Charlotte, NC | Factory Worker | 1999-7/31/2000 |

Job Duties: Decedent's job duties included, but were not limited to, drilling holes with a drill press for a new transmission housing, and performing work on casings. Decedent recalled co-worker Billy, last name unknown. Plaintiff is currently unaware if decedent was exposed to asbestos during this employment.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|----------|----------------------|-----------|----------------|
| City of Benicia 250 East L Street Benicia, CA | Waste Treatment Plant Benicia, CA | Laboratory Assistant | 10/2001-2005 |

Job Duties: Decedent's job duties included, but were not limited to, working part-time maintaining a black water sampling machine per EPA reporting regulations. Decedent recalled supervisor Jennifer Harrington. Decedent is currently unaware if he was exposed to asbestos during this employment.

9                                                        EXHIBIT "A"